**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TZVIA WEXLER**<br><br>     **Plaintiff,**<br><br>     **v.**<br><br>**CHARMAINE HAWKINS and<br>JAMES KOENIG**<br><br>     **Defendants.** | **CIVIL ACTION NO.  19-5760** |

<u>**MEMORANDUM OPINION**</u>

**Rufe, J.**                                                            **June 21, 2024**

On January 23, 2024, after a five-day trial, a Pennsylvania jury found Defendants

Philadelphia Police Officer Charmaine Hawkins and Detective James Koenig liable on counts of

false arrest, malicious prosecution, and retaliation, and further found Officer Hawkins liable on

counts of assault and battery and excessive force.[1] The claims arose from troubling allegations of

police misconduct during and after an altercation between Plaintiff Tzvia Wexler and Officer

Hawkins at the 2019 Philadelphia Pride Parade. This was not a verdict against all law

enforcement officers. In fact, it was anything but. The verdict was specific to two public servants

who failed to execute their sworn roles to protect and defend the citizenry. Defendants have filed

a motion seeking alternative forms of post-trial relief, including a new trial, entry of judgment as

a matter of law, and remittitur of the verdict.[2] For the reasons set forth below, Defendants'

motion will be denied, except as to a partial remittitur of the jury's punitive damages award.

---

[1] Verdict Form at 1–4 [Doc. No. 84]; Civil J. [Doc. No. 87].

[2] Defs.' Mot. Post-Trial Relief [Doc. No. 102].

## I.  FACTUAL BACKGROUND

In setting forth the following factual background, the Court draws all reasonable inferences in favor of Plaintiff, the verdict winner.[3] On Sunday, June 9, 2019, Mrs. Wexler and her husband, David Wexler, rode their electric bicycles to synagogue to celebrate the Shavuot holiday.[4] The synagogue is located between 4th and 5th Streets and between Market and Arch Streets in the City of Philadelphia.[5] After the service, Mrs. Wexler rode her bicycle in the westerly direction of Rittenhouse Square to meet someone for lunch, while Mr. Wexler left in a different direction for home.[6] Unbeknownst to the Wexlers, June 9, 2019, was also the date of the Philadelphia Pride Parade. As Mrs. Wexler approached the corner of 5th and Market Streets, she saw a large crowd participating in the parade, so she dismounted her bicycle and began walking.[7]

When Mrs. Wexler, walking southbound from Arch to Market Streets, attempted to cross Market Street on foot, a police officer told her that she could not cross at that intersection and gestured toward the 6th Street intersection.[8] At trial, Mrs. Wexler introduced video evidence showing officers permitting pedestrians to cross at that intersection.[9] Mrs. Wexler began walking westbound on Market Street toward 6th Street, with the parade on her left side moving in the

---

[3] *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 372 (3d Cir. 1987) ("Because a jury determined the issue, our scope of review is limited to examining whether there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner."). Among various alternative requests for relief, Defendants seek judgment as a matter of law "on all but Plaintiff's excessive force and assault and battery claims against Defendant Hawkins . . . ." Defs.' Mem. Supp. Mot. Post-Trial Relief at 5 [Doc. No. 104]. Accordingly, the sufficiency of the evidence presented at trial is now at issue as to Plaintiff's false arrest, malicious prosecution, and retaliation claims.

[4] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 62.

[5] D. Wexler Test., Trial Tr. Jan. 17, 2024, at 26.

[6] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 63; D. Wexler Test., Trial Tr. Jan. 17, 2024, at 46–47.

[7] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 63, 65–66.

[8] *Id.* at 63–64, 67.

[9] Hawkins Test., Trial Tr. Jan. 18, 2024, at 201–06.

opposite direction.[10] She then heard Officer Hawkins calling out that she should not be walking

on the street.[11] Mrs. Wexler attempted to explain that she had been directed by another officer to

walk toward 6th Street where she could cross Market Street.[12] After Officer Hawkins gestured

toward the sidewalk and told Mrs. Wexler a second time to get off of the street, Officer Hawkins

grabbed the bicycle.[13]

 The jury was tasked with weighing the credibility of Mrs. Wexler and Officer Hawkins's

conflicting testimony about what happened next. Credibility was of central importance at trial

because the incident was not captured on Officer Hawkins's body-worn camera.[14] Officer

Hawkins's explanation for the lack of footage was that "sometimes when you hit it, it doesn't

turn on."[15] However, Sergeant Jay Paul Bowen III, an expert on body-worn cameras who

reviewed the device's audit trail, testified that Officer Hawkins had pushed the button on her

device only one time, at 12:23 p.m.—several minutes after the time of the incident reflected in

police department records—and that the button was not pressed a second time, as required for the

camera to begin recording.[16] Officer Hawkins admitted to missing most of the training about

body-worn cameras after they were introduced to her district, but agreed that she had

successfully recorded footage on a few previous occasions before the incident.[17] Plaintiff's

counsel also directed Officer Hawkins to her testimony at the preliminary hearing on the criminal

---

[10] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 120.

[11] *Id.* at 69, 120;

[12] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 69, 122.

[13] *Id.* at 69–70, 121–22; Hawkins Test., Trial Tr. Jan. 18, 2024, at 225.

[14] Bowen Test., Trial Tr. Jan. 22, 2024, at 266.

[15] Hawkins Test., Trial Tr. Jan. 18, 2024, at 186.

[16] Bowen Test., Trial Tr. Jan. 22, 2024, at 265, 272–73; Joint Ex. 5 (12:15 p.m. in Arrest Report); Joint Ex. 10 (12:18 p.m. in Medical Checklist).

[17] Hawkins Test., Trial Tr. Jan. 18, 2024, at 158, 185–86.

charges in July 2019, during which she stated that "[t]he camera was on and it was buffering but [she] didn't get a chance to push it."[18]

Mrs. Wexler provided a consistent account of the relevant events from the stand. She recounted that Officer Hawkins shoved the bicycle into her from behind, moved toward the front of the bicycle, and then shoved Mrs. Wexler with the bicycle again.[19] Mrs. Wexler testified that she asked for Officer Hawkins's name and badge number because she "felt like it's not right what she's doing . . . ."[20] Mrs. Wexler testified that immediately thereafter, Officer Hawkins—perhaps, Mrs. Wexler posited, because the request for her badge number was "a trigger"—grabbed Mrs. Wexler's neck and choked her for what "felt [like] forever," to the point that Mrs. Wexler thought it was "the end of [her] life."[21]

Officer Hawkins gave a different account. According to Officer Hawkins, she was directing the bicycle toward the sidewalk when Mrs. Wexler "jerked the bike" and hit Officer Hawkins on her left side.[22] Officer Hawkins expressed her belief that the first hit was unintentional, but when Mrs. Wexler jerked the bicycle a second time, Officer Hawkins told Mrs. Wexler that she "was going to be sorry" if she hit her with the bicycle again.[23] Officer Hawkins testified that Mrs. Wexler then jerked the bicycle "at least three more times after that"—*i.e.*, a total of five times—but when pressed, she later revised her testimony to say that it was merely "several times."[24] When Plaintiff's counsel directed Officer Hawkins to a

---

[18] *Id.* at 262.

[19] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 69–70, 123–24, 128–29.

[20] *Id.* at 74–75; *see also id.* at 123, 130–31.

[21] *Id.* at 71, 135; *see also id.* at 125, 128–29, 132.

[22] Hawkins Test., Trial Tr. Jan. 18, 2024, at 225–29.

[23] *Id.* at 228.

[24] *Id*. at 228–29.

contradictory statement she gave after the incident to James Koenig, the assigned investigative detective, she again revised her testimony to say that, in total, it was "two times at least" or "more than once . . . ."[25] Mrs. Wexler denied hitting Officer Hawkins with the bicycle.[26]

At first, Officer Hawkins denied outright that she ever put her hand around Mrs. Wexler's neck.[27] She later clarified that she "did not put her *hands* around [Mrs. Wexler's] neck," but she did "put *one hand* around [Mrs. Wexler's] neck area."[28] Notwithstanding this admission, Officer Hawkins continued to maintain that she "never choked her."[29] Mrs. Wexler introduced two photographs, which were taken the following day when she returned home, showing red markings on her neck and a crescent-shaped wound.[30] Plaintiff's counsel directed Officer Hawkins to her preliminary hearing testimony, during which Officer Hawkins previously admitted under oath that she "grabbed her and my hand was around her neck."[31] Plaintiff's counsel also introduced video footage captured by Officer Marisol Ramirez's body-worn camera after the incident (the "Ramirez video"), showing Officer Hawkins smiling and laughing while telling a colleague that she got into "a fight" but would tell her about it later because there were "too many witnesses."[32]

Officer Hawkins removed her hand from Mrs. Wexler's neck when another officer, Timothy O'Reilly, arrived on scene.[33] Officer O'Reilly was assigned on bike patrol during the

---

[25] *Id.* at 229–30.

[26] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 93.

[27] Hawkins Test., Trial Tr. Jan. 18, 2024, at 238.

[28] *Id.* at 239 (emphasis added).

[29] *Id.*

[30] Joint Exs. 23, 24; T. Wexler Test., Trial Tr. Jan. 17, 2024, at 93–95.

[31] Hawkins Test., Trial Tr. Jan. 18, 2024, at 247–48.

[32] *Id.* at 267–68; Joint Ex. 30 (Ramirez video).

[33] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 71–72.

parade.[34] He testified that he saw Mrs. Wexler and Officer Hawkins grabbing each other in their neck areas as he approached.[35] Officer O'Reilly took Mrs. Wexler to the area near 6th and Market Streets and asked for her driver's license.[36] He then began filling out a Code Violation Notice ("CVN").[37] Mrs. Wexler took two photographs on her phone—one of Officer O'Reilly standing next to Officer Hawkins, and another of Officer O'Reilly writing on the CVN form.[38] Mrs. Wexler never received a copy of the CVN that Officer O'Reilly filled out, including through discovery in this case.[39] Officer O'Reilly instructed Mrs. Wexler to wait on the sidewalk, during which time Mrs. Wexler expressed to the officers that she was having trouble breathing, felt like she could not swallow, and wanted to go to the hospital.[40]

As captured on her post-incident body-worn camera footage, Officer Ramirez, at some distance away from the scene, asked Officer Hawkins "why she's not in cuffs," to which Officer Hawkins responded, "[be]cause they was gonna do a CVN on her first and just disorder, disorderly conduct, but then because I got the marks on me, and she talking about she wanna go to the hospital."[41] After Mrs. Wexler had been waiting for close to an hour, an unidentified female officer arrived with handcuffs and told Mrs. Wexler that she was being arrested.[42]

---

[34] O'Reilly Test., Trial Tr. Jan. 22, 2024, at 175.

[35] *Id.* at 185.

[36] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 72.

[37] O'Reilly Test., Trial Tr. Jan. 22, 2024, at 179, 181.

[38] Joint Exs. 25, 26; T. Wexler Test., Trial Tr. Jan. 17, 2024, at 75–76.

[39] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 169.

[40] *Id.* at 73.

[41] Joint Ex. 30 at 1:22:17; *see also* Hawkins Test., Trial Tr. Jan. 18, 2024, at 254–56.

[42] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 79–80; *see also* Joint Ex. 5 (arrest report).

Mrs. Wexler was placed in a police wagon and transported to the Police Detention Unit at 750 Race Street, where her intake was processed and she was detained.[43]

At about 3:10 p.m. on the day of the arrest, Detective James Koenig of the Philadelphia Police Department's Central Detective Division, the detective assigned to the incident, interviewed Officer Hawkins.[44] Officer Hawkins brought with her two incident reports and a Biographical Information Report containing Mrs. Wexler's information (Form 75-229 or a "229").[45] Officer Hawkins suggested in the two incident reports that Mrs. Wexler was the first to escalate the confrontation, specifically by grabbing Officer Hawkins by the shirt collar and forearm (as she wrote in one report) or by grabbing her face (as she wrote in another report), before Officer Hawkins attempted to make the initial arrest using a "control hold."[46] This account was contradicted by Mrs. Wexler's testimony that she may have reacted involuntarily *after* Officer Hawkins began choking her, but she could not recall exactly what happened and did not knowingly scratch Officer Hawkins in the face, neck, or arms.[47]

Detective Koenig explained on the stand that his general practice was to begin his interviews by asking basic questions to develop "an understanding of what happened," without recording the discussion or taking notes, and only after that preliminary conversation would he proceed with preparing his written report.[48] He wrote in his Investigation Interview Report that

---

[43] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 80, 83–84; Koenig Test., Trial Tr. Jan. 18, 2024, at 88–89.

[44] Koenig Test., Trial Tr. Jan. 17, 2024, at 183–84; Joint Ex. 6. Detective Koenig became the assigned detective because he was on duty at the Central Detective Division at the time Officer Hawkins came in to make her report. Koenig Test., Trial Tr. Jan. 17, 2024, at 184.

[45] Koenig Test., Trial Tr. Jan. 17, 2024, at 193–94; Joint Ex. 1 (First Complaint or Incident Report); Joint Ex. 2 (Second Complaint or Incident Report); Joint Ex. 11 (Biographical Information Report).

[46] Joint Exs. 1, 2, 6.

[47] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 137 ("I'm not sure if maybe involuntarily I moved my hand. I have no idea what I did in that moment . . . ."). Photographs later taken by Detective James Koenig showed small cuts on Officer Hawkins's face and arm, and mild redness near the collar of her uniform. Joint Exs. 7, 8, 9.

[48] Koenig Test., Trial Tr. Jan. 18, 2024, at 42.

Officer Hawkins recalled Mrs. Wexler being irate, yelling that she did not want to go to the sidewalk, and hitting Officer Hawkins twice with her bicycle.[49] The Report also states that Mrs. Wexler grabbed Officer Hawkins by the collar and pulled her, after which Officer Hawkins "attempted to arrest her using control holds . . . ."[50] The Report does not reference any contact with Mrs. Wexler's neck; it omits her request for Officer Hawkins's name and badge number; and it does not address the absence of footage from Officer Hawkins's body-worn camera.[51] The Report reflects a question from Detective Koenig about whether Officer Hawkins had suffered any injuries, but no questions about whether Mrs. Wexler had been injured.[52] Detective Koenig did not meet or communicate with Mrs. Wexler as part of his investigation, and he took photographs of Officer Hawkins but not of Mrs. Wexler, both in contravention of the Philadelphia Police Department Directives governing assault-on-police investigations.[53]

Detective Koenig testified that he believed Officer Hawkins's version of events because "[s]he's a sworn officer," and he felt comfortable leaving her signature line blank at the bottom of his Report for the same reason.[54] Detective Koenig also testified that he was never made aware of the CVN that Officer O'Reilly prepared at the scene.[55] Plaintiff's counsel engaged in a vigorous line of questions regarding why a CVN completed by an eyewitness police officer would have been omitted from the assigned detective's case file, particularly given Detective Koenig's understanding that a CVN and an arrest provide an "either/or" approach in response to

---

[49] Joint Ex. 6.

[50] *Id.*

[51] *Id.*; *see also* Koenig Test., Trial Tr. Jan. 17, 2024, at 218–19 ("I didn't know she had it. I didn't know she wore one, so I wouldn't have asked.").

[52] Joint Ex. 6.

[53] Koenig Test., Trial Tr. Jan. 18, 2024, at 34–38, 67–68, 89.

[54] *Id.* at 66.

[55] *Id.* at 28. According to Detective Koenig, Officer O'Reilly's name never came up at all. *Id.* at 30.

an incident.[56] Detective Koenig agreed that police supervisors have a duty to gather witness information, but he testified that he was never contacted by a supervisor about any names.[57] Officer Hawkins's paperwork did not contain any witness information.[58] Plaintiff's counsel noted in his questioning that the incident happened on the parade route, and the available body-worn camera footage from the event showed a crowd of civilians lined up to enjoy the parade, as well as rows of uniformed officers surveilling the route.[59]

Based solely on the documents and information conveyed to him by Officer Hawkins, Detective Koenig "believed [he] had enough," and he decided to submit criminal charges against Mrs. Wexler to the District Attorney's Office ("DA") through the Preliminary Arraignment Reporting System ("PARS").[60] The charges were required to be approved by Detective Koenig's immediate supervisor, who in turn was required to receive approval from a captain or another of higher rank.[61] Five charges were submitted to the DA: one felony offense of aggravated assault for the purported attack on Officer Hawkins, three misdemeanor offenses of possession of an instrument of crime (*i.e.*, the bicycle) with intent to employ it criminally, simple assault, and recklessly endangering another person, and one summary offense of harassment.[62]

---

[56] *Id.* at 28–30.

[57] Koenig Test., Trial Tr. Jan. 17, 2024, at 199–200.

[58] *Id.* at 196.

[59] *Id.* at 197, 199; *see also id.* at 200 (reflecting question from Plaintiff's counsel about the fact that "the Pride parade in 2019 was televised"); *see generally* Joint Ex. 30.

[60] Koenig Test., Trial Tr. Jan. 17, 2024, at 196 ("Q. You made the decision to do it right then and to charge her right then, correct? A. Yes."); Koenig Test., Trial Tr. Jan. 18, 2024, at 7, 9 (discussing PARS).

[61] Koenig Test., Trial Tr. Jan. 18, 2024, at 9. During his testimony, Koenig recalled that Sergeant Taylor called someone for approval, possibly the supervisor on night command, with a badge number of #114. *Id.* at 10, 83.

[62] Joint Ex. 5.

Mrs. Wexler was held at the Police Detention Unit for approximately 16 hours, until she was released and picked up by her husband around 2:00 or 3:00 a.m. the next day.[63] She appeared in court several times and was required to retain counsel to defend herself against the criminal charges, some of which were held over after a preliminary hearing.[64] All remaining charges were withdrawn later by the DA.[65] After hearing all of this evidence, the jury found that Officer Hawkins intentionally used excessive force and assaulted and/or battered Mrs. Wexler; that Officer Hawkins and Detective Koenig arrested Mrs. Wexler without probable cause; that Officer Hawkins and Detective Koenig maliciously prosecuted Mrs. Wexler; and that Officer Hawkins and Detective Koenig retaliated against Mrs. Wexler.[66]

At trial, Mrs. Wexler did not present monetary figures regarding compensatory damages caused by Defendants' conduct. Instead, Mrs. Wexler relied upon her husband's and her own testimony, as well as the photographs of her injuries. The jury awarded $4,000 in compensatory and $500,000 in punitive damages against Officer Hawkins and $2,000 in compensatory and $500,000 in punitive damages against Detective Koenig, for a total of $6,000 in compensatory and $1,000,000 in punitive damages.[67]

---

[63] T. Wexler Test., Trial Tr. Jan. 17, 2024, at 87–88.

[64] *Id.* at 89–90, 111.

[65] *Id.* at 91, 112. The parties also entered a joint statement, attached to this Opinion, agreeing not to contest that the proceedings terminated in Mrs. Wexler's favor. Joint Statement at 1.

[66] Verdict Form at 1–4 [Doc. No. 84].

[67] The verdict sheet contained the following questions:

    As to the federal claims under 42 U.S.C. § 1983:

  1.   Excessive Force . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant Officer Charmaine Hawkins intentionally committed an act on June 9, 2019 that violated Plaintiff's Fourth Amendment right not to be subjected to excessive force? . . . .

  2.   Unlawful Arrest . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant(s) arrested Plaintiff without probable cause on June 9, 2019? . . . .

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court,"[68] "but 'it should do so only when the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand . . . .'"[69] "The authority to grant a new trial resides in the exercise of sound discretion by the trial court . . . ."[70]

---

3.  <u>Malicious Prosecution</u> . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant(s) initiated criminal proceedings against Plaintiff without probable cause, and with malice or for a purpose other than bringing her to justice? . . . .

4.  <u>Retaliation for Protected Speech</u> . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant Officer Charmaine Hawkins retaliated against Plaintiff for engaging in protected speech? . . . .

As to the claims under Pennsylvania law:

5.  <u>Assault and Battery</u> . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant Officer Charmaine Hawkins committed the intentional tort of assault and/or battery against Plaintiff? . . . .

6.  <u>False Imprisonment / False Arrest</u> . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant(s) committed the intentional tort of false imprisonment and/or false arrest against Plaintiff? . . . .

7.  <u>Malicious Prosecution</u> . . . Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant(s) committed the intentional tort of malicious prosecution against Plaintiff? . . . .

8.  <u>Compensatory Damages</u> . . . Please state the amount that will fairly compensate Plaintiff Tzvia Wexler for any injury or harm that she actually sustained that was proximately caused by Defendant(s). If you do not find that the conduct of the Defendant(s) proximately caused any injury or harm, then enter an award of nominal damages for Plaintiff in the amount of $ 1.00. . . .

9.  Do you find by a preponderance of the evidence that Defendant(s) acted maliciously or wantonly in violating Plaintiff's rights?

10.  <u>Punitive Damages</u> . . . Do you award punitive damages against Defendant(s)? . . . If yes, in what amount?

Verdict Form at 1–5 [Doc. No. 84]. The jury answered "Yes" to all questions requiring a "Yes" or "No" response—*i.e.*, all questions except for the eighth question—and further responded "Yes" to the sub-components of the first seven questions regarding whether the respective conduct caused Plaintiff injury or harm. For the eighth and tenth questions, the jury apportioned the compensatory and punitive damages awards between the two Defendants.

[68] Fed. R. Civ. P. 59(a)(1)(A).

[69] *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 163 (3d Cir. 2018) (quoting *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016)).

[70] *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995).

Under Rule 50(b), a moving party may prevail on a renewed motion for judgment as a matter of law by establishing that there was no "legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing party] on that issue."[71] A court considering such a motion "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'"[72] "The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury."[73] "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."[74]

Under Rule 59(e), a party may seek alteration or amendment of the verdict. The trial court, in its sound discretion, may issue a remittitur when a damages award is unsupported or excessive—*i.e.*, when "the jury has [not] come to a rationally based conclusion" based on the evidence presented.[75]

## III. DISCUSSION

Defendants identify what they contend are numerous prejudicial errors which warrant a new trial or a partial new trial. In the alternative, Defendants challenge the sufficiency of the evidence as to all counts except excessive force under § 1983 and assault and battery under state

---

[71] Fed. R. Civ. P. 50(a)(1).

[72] *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir. 1993) (quoting *Keith v. Truck Stops Corp.*, 909 F.2d 743, 745 (3d Cir. 1990)), *abrogation on other grounds recognized by United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir. 2003).

[73] *Parkway Garage*, 5 F.3d at 691 (quoting *Blair v. Manhattan Life Ins. Co.*, 692 F.2d 296, 300 (3d Cir. 1982)).

[74] *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citation omitted).

[75] *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (citing *Murray v. Fairbanks Morse*, 610 F.2d 149, 152–53 (3d Cir. 1979)).

law against Officer Hawkins. Finally, Defendants contend that the punitive damages award was unconstitutionally excessive. The Court addresses each argument in turn.

### A. The Evidence Was Sufficient to Support the Jury's Findings Under Rule 50(b)

The Court first addresses the sufficiency of the evidence. Defendants raise numerous arguments under Rule 50(b), none of which have force. The evidence presented at trial, summarized in detail above, exceeds the "minimum quantum of evidence" necessary for a reasonable jury to have reached a verdict of liability on each count.[76]

As previously discussed, the jury's assessment of witness credibility was paramount in this case. Defendants contend that they are entitled to judgment as a matter of law because Mrs. Wexler admitted to injuring Officer Hawkins, and therefore probable cause was satisfied. However, Mrs. Wexler was adamant during her testimony that she did not intentionally scratch Officer Hawkins's face or arm and could not recall even inadvertently doing so. Given the inconsistencies between Officer Hawkins's account at trial and the documentary evidence (as well as her prior statements under oath), and her equivocal testimony surrounding the lack of body-worn camera footage and disappearance of the CVN, a reasonable jury could have chosen to believe Mrs. Wexler's account over Officer Hawkins's version of events.

Defendants suggest that Officer Hawkins's account was indisputably corroborated by Officer O'Reilly's eyewitness testimony, but Officer O'Reilly did not claim to have witnessed the initial altercation. Rather, he merely stated that he saw both Officer Hawkins and Mrs. Wexler grabbing each other in their neck areas as he made his approach.[77] Officer

---

[76] *Parkway Garage, Inc.*, 5 F.3d at 691 (citation omitted).

[77] Officer O'Reilly was wearing a body-worn camera, but like Officer Hawkins, he did not initiate a recording. *See* Bowen Test., Trial Tr. Jan. 22, 2024, at 266–67.

O'Reilly's testimony was not *per se* inconsistent with Mrs. Wexler's narrative, and it does not entitle Defendants to judgment as a matter of law over the jury's factual findings.

Additionally, Defendants contend that the evidence was insufficient to establish a causal link between Mrs. Wexler's request for Officer Hawkins's name and badge number (or other constitutionally protected conduct) and the alleged retaliatory actions. Mrs. Wexler testified that she orally requested Officer Hawkins's name and badge number because of what she perceived to be wrongful police conduct—specifically, Officer Hawkins shoving the bicycle into Mrs. Wexler at the beginning of the confrontation. Mrs. Wexler stated her opinion that Officer Hawkins may have choked her because the oral request was a trigger, but she admitted that she did not know what Officer Hawkins was thinking.

Even if Mrs. Wexler's testimony were not sufficient on its own, a reasonable jury could have inferred causation from the other circumstantial evidence presented at trial. The jury could have reasonably disbelieved that Mrs. Wexler hit Officer Hawkins with the bicycle, given the lack of evidence of any injuries to Officer Hawkins's hip area where the bicycle purportedly hit her,[78] and it could have discredited the inconsistent incident reports Officer Hawkins wrote suggesting that Mrs. Wexler was the first to make physical contact. Accordingly, a reasonable jury could have concluded that Officer Hawkins escalated the physical confrontation for a different reason: because she was angered by Mrs. Wexler's oral complaint and request for her badge ID number. The jury also could have relied upon the Ramirez video, in which Officer Hawkins explained that police officials were choosing to make an arrest—rather than pursuing the CVN already completed by Officer O'Reilly at the scene—due in part to Mrs. Wexler's requests to go to a hospital.

---

[78] *See* Hawkins Test., Trial Tr. Jan. 18, 2024, at 226–27.

For similar reasons, the evidence was sufficient for a reasonable jury to have found that Officer Hawkins and Detective Koenig each maliciously initiated the criminal proceedings against Mrs. Wexler by providing false information or withholding facts. For the reasons previously discussed, the jury could have reasonably found that Officer Hawkins's written incident reports and interview statements contained falsehoods, thereby causing the DA to pursue criminal charges without an accurate understanding of the facts. A reasonable jury also could have found malice, in that the charging decision came only after Mrs. Wexler's request to go to a hospital due to her injuries (as Officer Hawkins admitted in the Ramirez video).

Likewise, the evidence was sufficient for a reasonable jury to find that Detective Koenig initiated the upgraded felony charges and acted with malice by unreasonably accepting Officer Hawkins's version of events, without conducting any meaningful investigation to either corroborate or refute her account, notwithstanding his duty to do so as the assigned investigative detective. In particular, evidence was presented that the duties imposed upon Detective Koenig by the Philadelphia Police Department Directives covering assault-on-police investigations included, at a minimum, an obligation to interview Mrs. Wexler, document and photograph her injuries, confirm the availability of eyewitnesses, and verify the existence or nonexistence of body-worn camera footage—*i.e.*, the steps required to conduct a thorough investigation.[79] A reasonable jury could have found that Detective Koenig chose intentionally not to take those basic (and mandatory) investigative steps.

Finally, Defendants contend that the evidence at trial was insufficient to establish the personal involvement of Officer Hawkins and Detective Koenig in Mrs. Wexler's arrest.

---

[79] *See* Koenig Test., Trial Tr. Jan. 17, 2024 at 182–83, 194–95, 199 (discussing policies regarding review of any available body-worn camera footage and identification of eyewitnesses); Koenig Test., Trial Tr. Jan. 18, 2024 at 34–37 (regarding interviews of all involved police and civilians and photographing injuries of both police and civilians).

Defendants would have this Court hold that any officer who does not physically place handcuffs onto an individual, or personally drive that individual to the Police Detention Unit, cannot be found liable for an unlawful arrest under § 1983. That is an untenable interpretation of the law. In *Lozano v. New Jersey*, the case on which Defendants rely, the Third Circuit held that mere presence at the scene or driving an arrestee to the police station, without more, is *insufficient* to defeat qualified immunity under § 1983.[80] The *Lozano* decision reveals that the framework of analysis is not a box-checking exercise, but rather an inquiry into the substantive nature of a defendant's involvement in the arrest and detention.[81]

Indeed, if the Court were to apply the plain reasoning of the *Lozano* decision, it may well be that the unknown officers who placed handcuffs on Mrs. Wexler and drove her to the Police Detention Unit would not face liability under § 1983. That is because the evidence presented at trial showed that those officers (and eventually, city prosecutors) relied on the probable-cause representations of Officer Hawkins, who stated in her use of force report that she was the first to "attempt[ ] to arrest the offender for assault on police,"[82] and who was identified by Detective Koenig at trial as the arresting officer.[83] A reasonable jury could readily have found Officer Hawkins's level of involvement to be sufficient for liability on the unlawful arrest count. Evidence was also presented regarding Detective Koenig's decision to rely blindly on Officer Hawkins's narrative, to decline to conduct any further investigation, and to then submit criminal charges against Mrs. Wexler through the PARS system based solely on Officer Hawkins's

---

[80] *Lozano v. New Jersey*, 9 F.4th 239, 246 (3d Cir. 2021).

[81] *Id.* at 242 (describing, by contrast, the actions of the defendant police sergeant who made the initial contact, investigated what he suspected to be criminal activity, attempted to conduct a sobriety test, and then made the arrest after the suspect refused to submit to the test).

[82] Joint Ex. 3 at 5.

[83] Koenig Test., Trial Tr. Jan. 18, 2024, at 8.

facially inconsistent account. At a minimum, those decisions led to Mrs. Wexler's continued

detention while the charges were prepared, submitted, and processed. The evidence was

sufficient for a reasonable jury to have found liability against Detective Koenig.

**B.  A New Trial Is Not Warranted Under Rule 59(a) for Improper Jury Instructions**

In the alternative, Defendants argue that they are entitled to a new trial due to a series of

purported errors in the Court's jury instructions. "A party is entitled to a jury instruction that

accurately and fairly sets forth the current status of the law."[84] "[S]o long as the jury instructions

provide an accurate and fair statement of the law, the trial judge has discretion as to the style and

wording employed."[85] The Model Civil Jury Instructions for the District Courts of the Third

Circuit are neither law nor precedential, and they do not replace the shared obligation of litigants

and trial courts to correctly distill the law.[86]

    1.  <u>Defendants Cannot Challenge Language They Proposed and To Which
       Plaintiff Stipulated</u>

The Third Circuit has "long held that when a party jointly recommends a jury instruction,

it cannot later complain about that very instruction."[87] Several of the purported errors Defendants

identify cannot be challenged now, because they were delivered by the Court in substantially

identical form to the jointly proposed instructions submitted before trial.[88] First, as to the federal

unlawful arrest claim, Defendants contend that the Court erred by failing to charge the jury with

---

[84] *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995) (citing *McPhee v. Reichel*, 461 F.2d 947, 950 (3d Cir. 1972)).

[85] *Gilmore v. Macys Retail Holdings, Inc.*, 385 F. App'x 233, 239 (3d Cir. 2010) (citing *Douglas*, 50 F.3d at 1233).

[86] *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 190 (3d Cir. 2019).

[87] *Id.* at 189 (citing *United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008)).

[88] On August 14, 2023, Defendants filed their initial proposed jury instructions. Proposed Jury Instrs. [Doc. No. 49]. The parties' joint statement, emailed to the Court on December 21, 2023, stated that the parties stipulated to the language of the initial proposed instructions. Joint Statement at 2. On December 29, 2023, Defendants sent an amended version of the proposed instructions to the Court via email, which was revised only to reflect Plaintiff's voluntarily withdrawal of a defendant and claim. *See* Stipulation and Order, Dec. 28, 2023 [Doc. No. 69].

deciding whether Officer Hawkins or Detective Koenig arrested or detained Mrs. Wexler. The

Court instructed the jury as follows:

> An arrest is a seizure. And the Fourth Amendment prohibits Police officers from
> arresting a person, unless there is probable cause to do so. In this case,
> Mrs. Wexler claims that Officer Hawkins and Detective Koenig each arrested her.
> You must decide whether Mrs. Wexler has proved, by a preponderance of the
> evidence, that the defendants lacked probable cause to arrest her.[89]

This instruction was substantively identical to the language proposed by Defendants and to

which Mrs. Wexler stipulated.[90]

Second, as to the federal retaliation claim, Defendants argue that it was improper for the

Court to instruct the jury that asking for a police officer's name and badge number is

constitutionally protected speech. The Court instructed the jury as follows:

> Mrs. Wexler must prove that she engaged in speech or other conduct that is
> constitutionally protected. The First Amendment protects every citizen's right to
> freedom of speech and to petition the government for redress of grievances. . . .
> That includes speech criticizing or challenging police officers as well as asking
> for a police officer's badge number. . . . I instruct you that if you find that
> Mrs. Wexler has proven by a preponderance of the evidence that she asked for
> Officer Hawkins['] badge number or made other statements to Officer Hawkins
> that did not constitute a threat of violence, then that speech of hers was protected
> under the First Amendment. And therefore the first element requires no additional
> proof.[91]

Defendants' proposed jury instructions provided:

> I instruct you that if you find that Ms. Wexler has proven by a preponderance of
> the evidence that she asked for Officer Hawkins' badge number, then that speech
> was protected under the First Amendment and, therefore, the first element
> requires no additional proof.[92]

---

[89] Trial Tr. Jan. 23, 2024, at 105–06.

[90] *See* Proposed Jury Instrs. at 31 [Doc. No. 49].

[91] Trial Tr. Jan. 23, 2024, at 114–15.

[92] Proposed Jury Instrs. at 38 [Doc. No. 49].

Given the substantial similarity between the proposed instructions and the delivered charge, Defendants cannot claim now that the Court "usurped the jury's role" by instructing that a request for a badge number, if proven, constitutes protected speech.[93]

>   2.   <u>Initiation and Malice Elements of Malicious Prosecution Claim</u>

As to the federal malicious prosecution claim, Defendants contend that the Court erroneously instructed the jury by failing to distinguish between malice and the initiation of criminal proceedings as separate elements, and by adding incorrect language in its instructions regarding initiation. With respect to the initiation element, the Court instructed the jury that because criminal charges are formally filed by the District Attorney's Office, Mrs. Wexler was required to "prove that one or both of these Officers knowingly withheld facts from or provided false information to the Prosecutor[ ] [o]r caused the criminal proceedings to be formally initiated by other corrupt means."[94] The Court further clarified that establishment of the initiation element required finding "that Officer Hawkins and Det. Koenig interfered with the Prosecutor's informed discretion by hiding or mischaracterizing the truth[,] [t]hereby causing the District Attorney's Office to charge Mrs. Wexler . . . ."[95] As to the malice element, the Court instructed that Mrs. Wexler was required to "prove that in initiating the proceeding Officer Hawkins and Det. Koenig acted out of spite[,] . . . did not themselves believe that the proceeding was proper[,] . . . [or] initiated the proceeding for a purpose unrelated to bringing Mrs. Wexler to justice."[96]

---

[93] Defs.' Mem. Supp. Mot. Post-Trial Relief at 11 [Doc. No. 104]. The instruction was also correct. *See Montgomery v. Killingsworth*, Nos. 13-256, 13-3081, 13-3082, 2015 WL 289934, at *8 (E.D. Pa. Jan. 22, 2015) (holding that, as alleged, a request for an officer's name and badge number was protected activity for purposes of denying defendants' motion for summary judgment); *accord Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) ("The defendants do not deny that criticizing a police officer and asking for his badge number is protected speech under the First Amendment. Nor could they.").

[94] Trial Tr. Jan. 23, 2024, at 109–10.

[95] *Id.* at 110.

[96] *Id.* at 112.

Defendants' argument that the delivered charge conflated the initiation and malice elements is unavailing, given that the structure of the Court's instructions was entirely consistent with Defendants' proposal.[97] The delivered language concerning the fourth element—malice being established by proving spite, a lack of belief that the proceeding was proper, or initiation for a purpose unrelated to bringing Mrs. Wexler to justice—also tracked the language of Defendants' proposed submission.[98]

To the extent that Defendants suggest they are entitled to a new trial on the malicious prosecution claim solely because of the Court's addition of "by other corrupt means" in relation to the initiation element, that argument is without merit. Defendants protest that the Court "mischaracterize[d] the legal standard," because the model instructions only recommend the insertion of such language in cases where a plaintiff was previously indicted by a grand jury.[99] Defendants' argument reveals a fundamental misunderstanding of the applicable legal standard. In *Halsey v. Pfeiffer*, the Third Circuit held that it is "self-evident that a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process."[100] The *Halsey* court applied "settled law that 'officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor . . . act[s]

---

[97] Proposed Jury Instrs. at 33–35 [Doc. No. 49]. The Court struggles to make sense of Defendants' argument. The initiation and malice elements were unambiguously delineated in the delivered charge. Although Defendants favorably cite the Third Circuit's Model Jury Instructions, the delivered charge was structured in the same manner as Defendants' proposal, which in turn was based on Section 4.13 of the Third Circuit's model. The Court's few revisions were made only as necessary to tailor the charge to the facts of this case—*e.g.*, the Court could not use the model language concerning initiation, because that element is presumed to be undisputed in the model.

[98] Proposed Jury Instrs. at 34–35 [Doc. No. 49].

[99] Defs.' Mem. Supp. Mot. Post-Trial Relief at 9 [Doc. No. 104].

[100] *Halsey v. Pfeiffer*, 750 F.3d 273, 293 (3d Cir. 2014) (quotation marks and citation omitted).

independently to facilitate erroneous convictions,'"[101] and it held that "[i]f the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution."[102] As previously stated, "the trial judge has discretion as to the style and wording employed" in the jury instructions "so long as [they] provide an accurate and fair statement of the law . . . ."[103] The reference to "other corrupt means" in the instructions was not in error, did not prejudice Defendants in any manner, and provides no basis for a new trial under Rule 59(a).

3.   Standard for Probable Cause and Omission of Summary Offense

Defendants raise several challenges to the Court's instructions on probable cause as to Mrs. Wexler's malicious prosecution and retaliation claims. First, Defendants contend that the Court erred by failing to instruct the jury that a finding of probable cause as to "any one of" the criminal charges against Mrs. Wexler defeats a claim of malicious prosecution. Second, as to retaliation, Defendants assert that the Court failed to differentiate between arrest and prosecution as the alleged retaliatory actions—*i.e.*, that the probable cause standard for both kinds of retaliation should have been included in the charge. Third, as to both retaliation and malicious prosecution, Defendants argue that the Court erroneously omitted the summary offense of harassment when providing the list of criminal offenses for the jury to consider.

In *Wright v. City of Philadelphia*[104] and *Johnson v. Knorr*,[105] the Third Circuit endorsed two probable cause standards for malicious prosecution claims which it later observed "are

---

[101] *Id.* at 297 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004)).

[102] *Halsey*, 750 F.3d at 297 (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09, 317 (6th Cir. 2010)).

[103] *Gilmore*, 385 F. App'x at 239 (citing *Douglas*, 50 F.3d at 1233).

[104] 409 F.3d 595 (3d Cir. 2005).

[105] 477 F.3d 75 (3d Cir. 2007).

difficult to reconcile."[106] In *Wright*, the Third Circuit held that a malicious prosecution claim was defeated by the existence of probable cause for at least one of the charges.[107] In *Johnson*, however, the Third Circuit adopted the rule "that probable cause on one charge does not foreclose a malicious prosecution cause of action against a defendant for having brought criminal charges involving different elements,"[108] although the *Johnson* court disclaimed any intent to "diminish the precedential status of [*Wright*] . . . ."[109] The Third Circuit has not resolved the tension between these two standards, but it has continued to apply the *Johnson* rule where appropriate.[110] Specifically, if the favorable termination element of a malicious prosecution claim is satisfied, guidance from the Third Circuit indicates that district courts must then "wrestle with the approaches set forth in *Johnson* and *Wright* to determine which provides the more appropriate framework to apply to a given set of facts."[111]

On June 20, 2024, after briefing in this case was completed, the Supreme Court decided *Chiaverini v. City of Napoleon*, holding that the existence of probable cause for one charge in a criminal proceeding does not create a categorical bar to bringing a malicious prosecution claim relating to other, baseless charges.[112] The Supreme Court's ruling, at a minimum, calls into question the viability of *Wright*. The Supreme Court's explicit endorsement of *Johnson* (and

---

[106] *Kossler v. Crisanti*, 564 F.3d 181, 194 (3d Cir. 2009), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022).

[107] *Wright*, 409 F.3d at 604.

[108] *Johnson*, 477 F.3d at 83 (citing *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)).

[109] *Johnson*, 477 F.3d at 82 n.9.

[110] *See, e.g.*, *Harvard v. Cesnalis*, 973 F.3d 190 (3d Cir. 2020); *Dempsey v. Bucknell Univ.*, 834 F.3d 457 (3d Cir. 2016); *see also Alburg v. Jones*, No. 21-2580, 2023 WL 2823895, at *3 (3d Cir. Apr. 7, 2023).

[111] *Kossler*, 564 F.3d at 194.

[112] *Chiaverini v. City of Napoleon*, No. 23-50, 602 U.S. ___, slip op. at 1 (June 20, 2024).

other circuit decisions applying the same standard)[113] provides a clear indication that the final

charge delivered in this case was, and is, a correct application of the prevailing law.[114]

The Court determined in this case, after taking defense counsel's objections and

arguments under advisement, that the *Johnson* standard provided the most appropriate

framework.[115] Here, as in *Johnson*, Mrs. Wexler alleged that Officer Hawkins and Detective

Koenig provided false and incomplete information to the DA, which caused the criminal charges

to be filed.[116] Moreover, Defendants' role in initiating those charges, as alleged, was not merely

the preparation of an affidavit of probable cause for arrest—*i.e.*, "the circumstances leading to

the arrest and prosecution" were not "totally intertwined."[117] Therefore, Plaintiff's theory of

liability was most consistent with the facts of *Johnson*, in that Defendants' involvement was

---

[113] *Id.* at 4 (citing *Johnson*, 477 F.3d at 83–85; *Posr*, 944 F.2d at 100; *Williams v. Aguirre*, 965 F.3d 1147, 1159–62 (11th Cir. 2020)).

[114] *Chiaverini*, slip op. at 5 ("Consistent with both the Fourth Amendment and traditional common-law practice, courts should evaluate suits like Chiaverini's charge by charge."). Relatedly, the Supreme Court issued another decision on the same date as *Chiaverini*, in the context of retaliation claims under the First Amendment, which further reinforces the principle that the presence of probable cause on a minor offense may not preclude civil rights claims under § 1983. *See Gonzalez v. Trevino*, No. 22-1025, 602 U.S. ___ (June 20, 2024).

[115] On the morning of the final day of trial proceedings, the Court had the following colloquy with defense counsel:

> MR. KANE: The City's position is, defendant's position that is, Your Honor, is this issue was actually raised on our Friday call. I brought up the fact that there is a tension between two cases. The cases are *Wright* and *Johnson*. . . . [U]ltimately what *Kossler* said is that it's a fact intensive inquiry as to whether or not *Johnson* or *Wright* should be applied.
>
> We don't believe the facts of *Johnson* apply in this case because defendant Hawkins brought all these charges at once and *Johnson* is distinguishable where they're sort of tacked on at the end. That is why we originally requested this being charges as they are now and that's why we're still requesting those, Your Honor.
>
> THE COURT: You think all the charges came at once in this case? See, that's another fact at issue that the jury has to determine. How did this charging progression occur. So, I don't think we can say that on the date of the offense she was charged with all of these offenses. We don't know. But the jury can figure it out from what they've heard.

Trial Tr. Jan. 23, 2024, at 4–5.

[116] *See Johnson*, 477 F.3d at 84.

[117] *Wright*, 409 F.3d at 598; *Johnson*, 477 F.3d at 82 n.9.

alleged to be more extensive and to have "lasted beyond . . . the arrest itself."[118] Presented with similar facts, other district courts in this Circuit have regularly applied the *Johnson* rule, guided by the *Johnson* court's "concern that drawing a rule of general applicability from *Wright* would permit officers to 'tack on more serious, unfounded charges . . . knowing that the probable cause on the lesser offense would insulate [them] from liability . . . .'"[119]

Defendants make the unsupported contention that the Court, by adopting the *Johnson* rule over Defendants' objection, "failed to instruct the jury on the proper legal standard[.]"[120] That argument is misplaced, as *Johnson* remains good precedent in this Circuit[121]—and indeed, is consistent with the prevailing rule now established by the Supreme Court.[122] In any event, even if the Court erred by applying the *Johnson* standard (which it did not), any error was harmless. The Court properly instructed the jury in accordance with the probable cause standard for unlawful arrest claims, which tracks the *Wright* framework.[123] The delivered charge on unlawful arrest also included the summary offense of harassment among the list of offenses the jury was instructed to consider.[124] Therefore, because the jury found Defendants liable for unlawful arrest, it necessarily determined that Mrs. Wexler proved, by a preponderance of the evidence, that

---

[118] *Johnson*, 477 F.3d at 84.

[119] *Rivera-Guadalupe v. Pierce*, No. 19-1400, 2023 WL 2647859, at *9 (M.D. Pa. Mar. 27, 2023) (quoting *Johnson*, 477 F.3d at 83); *see also, e.g.*, *Chamberlain v. City of Philadelphia*, No. 20-6572, 2023 WL 2868010, at *11 (E.D. Pa. Apr. 10, 2023); *Morency v. City of Allentown*, No. 19-5304, 2020 WL 1935640, at *9 (E.D. Pa. Apr. 22, 2020); *Kelly v. Jones*, 148 F. Supp. 3d 395, 407 (E.D. Pa. 2015).

[120] Defs.' Mem. Supp. Mot. Post-Trial Relief at 10 [Doc. No. 104].

[121] *See Alburg*, 2023 WL 2823895 at *3.

[122] *Chiaverini*, slip op. at 1, 4–5.

[123] *See* Trial Tr. Jan. 23, 2024, at 106 ("There is no false arrest, unless probable cause was lacking to arrest Mrs. Wexler for *any one of* the offense[s] with which she was charged.") (emphasis added).

[124] *Id.* at 106–07.

probable cause was lacking as to any one of the five offenses, including harassment.[125] Had the

Court adopted the *Wright* rule with respect to its instructions on malicious prosecution and

retaliation, it would have made no difference in the jury's finding of liability on those counts.

Defendants further argue that the Court "failed to properly state the standard for probable

cause" as to the Pennsylvania state law claims of false arrest and malicious prosecution.[126] For

the state law false arrest claim, the Court gave the following instruction:

> A false arrest is an arrest made without probable cause or an arrest made by a
> person without privilege to do so. Probable cause means that the person making
> the arrest believed at the time of the arrest and a reasonable person under the same
> circumstances would also have believed that they have sufficient information of
> both the facts and the applicable law to reasonably believe that a crime had been
> or was being committed and that the person arrested was guilty of committing the
> crime.[127]

This instruction was identical to Defendants' proposed language, which in turn was drawn from

the Pennsylvania Model Jury Instructions.[128] The argument cannot be raised now.[129]

The Court gave separate instructions on probable cause for the state law malicious

prosecution claim, as follows:

> As to the first element of Mrs. Wexler's malicious prosecution claim under
> Pennsylvania law, if you find that Officer Hawkins and Det. Koenig did not have
> a basis for believing that Mrs. Wexler committed [the crimes][130] with which she
> was charged[,] which I explained to you earlier, then Mrs. Wexler has established
> that Officer Hawkins and Det. Koenig acted without probable cause.

---

[125] Verdict Form at 1 [Doc. No. 84] (responding "Yes" to the question, "Has Plaintiff Tzvia Wexler proven by a preponderance of the evidence that Defendant(s) arrested Plaintiff without probable cause on June 9, 2019?").

[126] Defs.' Mem. Supp. Mot. Post-Trial Relief at 12 [Doc. No. 104].

[127] Trial Tr. Jan. 23, 2024, at 120.

[128] Proposed Jury Instrs. at 42 [Doc. No. 49].

[129] The instruction was also in Defendants' favor, by stating (correctly) that an officer need only believe that "a crime" had been committed to support a lawful arrest.

[130] The bracketed language is omitted in the trial transcript, but it was included in the hard-copy versions of the final charge provided to all counsel and the jury. *See* Defs.' Mem. Supp. Mot. Post-Trial Relief, Ex. D, at 33 [Doc. No. 104-4].

> If you find that Officer Hawkins and Det. Koenig had probable cause to initiate a prosecution for all of the crimes for which she was charged, then you must find in favor of the defendants on the Pennsylvania malicious prosecution claim.
>
> For malicious prosecution[,] probable cause on one charge does not foreclose a malicious prosecution cause of action as to a separate charge which lacks probable cause.[131]

Defendants cite *York v. Kahan*,[132] a recent decision from the Pennsylvania Commonwealth Court which endorsed the *Wright* rule. The *York* decision did not, however, hold that the *Wright* standard should apply in all circumstances. Rather, the court affirmed the trial court's instructions because it was "not persuaded that the facts of York's arrest or prosecution are aligned with those in *Johnson*"—specifically observing that "York failed to present facts that would distinguish it from the prevailing standard in *Wright*," with "no allegations that the Officers fabricated information or involved themselves beyond York's arrest to influence the prosecution."[133] Here, unlike in *York*, Mrs. Wexler presented ample evidence that Officer Hawkins and Detective Koenig involved themselves in the case beyond the arrest, and further that each Defendant influenced the prosecution by submitting false information or withholding facts. The Court's application of the *Johnson* rule was therefore appropriate.

### 4. Willful Misconduct

Defendants contend that the Court's omission of a separate question concerning willful misconduct in the jury verdict sheet was prejudicial error. The Court delivered detailed instructions regarding willful misconduct for the jury's consideration, and it did so at the outset,

---

[131] Trial Tr. Jan. 23, 2024, at 121–22. The instruction also contained the following language, which was identical to Defendant's proposed language: "If you find that Mrs. Wexler never struck, hit or scratched Officer Hawkins with her hands or her bicycle, then Mrs. Wexler has established that the Officers acted without probable cause." *Id.* at 122; Proposed Jury Instrs. at 44 [Doc. No. 49].

[132] 298 A.3d 533 (Pa. Commw. Ct. 2023).

[133] *Id.* at 547.

before delivering the charges as to any one of the intentional tort claims under state law.[134]

Defendants cite no case law supporting the proposition that the exclusion of a "Yes" or "No"

inquiry on the jury verdict sheet with respect to willful misconduct, standing alone, warrants a

new trial under Rule 59(a).[135] The Court will not award a new trial on this ground.

Defendants further assert that it was error to exclude language concerning willful

misconduct in the punitive damages charge. The scienter section of the Court's delivered charge

on punitive damages required a finding that Defendants acted maliciously or wantonly, which

tracked Defendants' proposed language and the Third Circuit's Model Instructions.[136]

Defendants again failed to object during trial, or before the jury deliberated, and they cannot

raise the argument now.

5.  <u>Police Officers' Privilege to Use Force</u>

Defendants argue that the Court's instructions "failed to properly state the Pennsylvania

Law police officer privilege to use force," thereby "usurp[ing] the jury's role in determining the

application of the privilege to Plaintiff's Pennsylvania Law assault and battery claims . . . ."[137]

As discussed with counsel off the record at the initial charge conference on January 18, 2024,

and as further discussed at length on the record during the second charge conference,[138] the

Court declined to adopt Defendants' proposed instruction out of concern that the language was

---

[134] Trial Tr. Jan. 23, 2024, at 116–17.

[135] Defendants cite several cases, but none support the proposition that the Court was required to include a separate question about willful conduct on the verdict sheet. In the first cited case from the Commonwealth Court, the jury never reached the question of willful misconduct because it found no liability on the malicious prosecution claim. *York*, 298 A.3d at 546–47. The second and third cited cases, *Pettit v. Namie*, 931 A.2d 790 (Pa. Commw. Ct. 2007), and *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994), were presented only with the issue of indemnification.

[136] *See* Trial Tr. Jan. 23, 2024, at 127–28; Proposed Jury Instrs. at 49–50 [Doc. No. 49].

[137] Defs.' Mem. Supp. Mot. Post-Trial Relief at 11–12 [Doc. No. 104].

[138] Trial Tr. Jan. 22, 2024, at 351–59.

excessive and did not comport with the facts alleged in this case.[139] The Court relied upon language from the Third Circuit's decision in *O'Keefe v. Lehigh University*[140] in crafting the following instruction:

> Now[,] a police officer is not liable for assault and battery under Pennsylvania law when she uses reasonable force to prevent interference [with] the exercise of her authority or the performance of her duty.
>
> Said differently, police officers are privileged to commit a battery pursuant to a lawful arrest. But the privilege is negated by the use of excessive force. The test[ ] for determining whether that force is excessive is the same as in [the] Fourth Amendment context. In other words, whether the police officers' actions were objectively reasonable in light of the facts and circumstances.[141]

The Third Circuit's language was drawn in part from the Pennsylvania Supreme Court's decision in *Renk v. City of Pittsburgh*,[142] one of the authorities Defendants cite as providing the proper standard.[143] Given the plain language of the delivered charge, the Court is not persuaded that the instruction "fail[ed] to define the application of the privilege to the Pennsylvania Law intentional tort of assault and battery," as Defendants contend.[144] The Court identifies no basis for a new trial in relation to this instruction.

### 6. Spoliation Instructions

"The admissibility of spoliation evidence and the propriety of the spoliation inference is well established in most jurisdictions, including Pennsylvania."[145] The doctrine provides that a

---

[139] Defendants' proposed language stated, *inter alia*, that "a police officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest" and "is justified in the use of any force which she believes to be necessary to effect the arrest and . . . to defend herself . . . ." Proposed Jury Instrs. at 41 [Doc. No. 49].

[140] No. 23-1235, 2024 WL 138578 (3d Cir. Jan. 12, 2024).

[141] Trial Tr. Jan. 23, 2024, at 122–23; *see also* Defs.' Mem. Supp. Mot. Post-Trial Relief, Ex. D, at 35 [Doc. No. 104-4]; *O'Keefe*, 2024 WL 138578 at *1.

[142] 641 A.2d 289 (Pa. 1994).

[143] Defs.' Mem. Supp. Mot. Post-Trial Relief at 12 [Doc. No. 104].

[144] *Id.*

[145] *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994).

court may admit "evidence tending to show that a party destroyed evidence relevant to the dispute being litigated," which "permit[s] an inference, the 'spoliation inference,' that the destroyed evidence would have been unfavorable to the position of the offending party.'"[146]

The Court gave two instructions for purposes of sanctioning Defendants' counsel because of irregularities during the discovery process. The first instruction related to the CVN written by Officer O'Reilly at the scene, which was never produced to Mrs. Wexler.[147] The second instruction concerned the scene supervisor from the Philadelphia Police Department, who was present during the arrest but whose name was not disclosed to Mrs. Wexler until Officer Hawkins testified at trial.[148] Defendants contend that these instructions were unsupported and unduly prejudicial. Relatedly, Defendants also argue that the Court erred by precluding Defendants from affirmatively using the Ramirez video, which was produced to Plaintiff mere days before trial commenced. The Court disagrees.

"When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm [her]."[149] Defendants did not challenge Mrs. Wexler's testimony that she never received a copy of the CVN, or the photograph Mrs. Wexler took on her phone of Officer O'Reilly writing one at the scene (which was introduced as a joint exhibit).[150] Officer O'Reilly confirmed during his testimony that he had written a CVN that day, ripped it off of his pad, and

---

[146] *Id.* at 78 (citing J. Gorelick, S. Marzen, & L. Solum, *Destruction of Evidence* § 2.1 (1989)).

[147] Trial Tr., Jan. 22, 2024, at 324; Trial Tr. Jan. 23, 2024, at 123–24.

[148] Trial Tr. Jan. 23, 2024, at 124.

[149] *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

[150] Joint Ex. 26; *see also* T. Wexler Test., Trial Tr. Jan. 17, 2024, at 169 ("Q. Have you ever to this day seen that document that Officer [O']Reilly was filling out that day, when you took the picture of him filling it out? A. No.").

then gave it to Officer Hawkins.[151] Officer Hawkins testified that she could not recall a CVN

ever being handed to her.[152] Detective Koenig testified that he was never made aware that one

ever existed, but he agreed that if one was written, it would have been important for him to

receive it.[153] In light of this evidence, the Court instructed the jury that it could assume the CVN

"would have been unfavorable to Officer Hawkins *only if* [it found] by a preponderance of the

evidence that; 1) Officer Hawkins intentionally destroyed the evidence or caused the evidence to

be destroyed and 2) Officer Hawkins [did so] . . . in bad faith."[154] This was not error.[155]

      The second instruction arose directly from counsel's late-breaking disclosure, mere days

before the beginning of trial, that highly relevant footage had been captured by the body-worn

camera of Officer Ramirez, which had not previously been produced to Mrs. Wexler. Plaintiff's

counsel represented to the Court that Mrs. Wexler requested footage from the body-worn

cameras of all officers in February 2021, after learning that there were no recordings from

Officer Hawkins's body-worn camera.[156] On the morning of the first day of trial, Defendants'

counsel made a brazen suggestion (with no supporting evidence) that the Ramirez video had in

---

[151] O'Reilly Test., Trial Tr. Jan. 22, 2024, at 177, 194.

[152] Hawkins Test., Trial Tr. Jan. 18, 2024, at 171–72.

[153] Koenig Test., Trial Tr. Jan. 18, 2024, at 28–30.

[154] Trial Tr., Jan. 23, 2024, at 123–24 (emphasis added); *see also Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) ("[A] finding of bad faith is pivotal to a spoliation determination.").

[155] Although Defendants cite, without further elaboration, the Third Circuit's decision in *Bull v. United Parcel Service, Inc.*, the record reflects that counsel had the opportunity to present evidence and argument that the CVN was not in Officer Hawkins's control (*e.g.*, her testimony that she could not recall receiving it), that it was irrelevant, that it was not actually suppressed or withheld, that her duty to preserve it was not reasonably foreseeable, or that the document was inadvertently lost or accidentally destroyed. 665 F.3d at 73, 79. After an extensive discussion with counsel on the penultimate day of trial, the Court concluded, in its discretion, that the matter should be presented to the jury. Trial Tr. Jan. 22, 2024, at 300–07. The Court properly instructed the jury that Mrs. Wexler was required to prove, by a preponderance of the evidence, that the CVN was intentionally destroyed in bad faith in order for the jury to assume that the CVN would have been unfavorable to Officer Hawkins.

[156] Trial Tr. Jan. 16, 2024, at 4–5, 8.

fact been previously produced.[157] Counsel then revised his position to state that he merely did not know whether the video had been produced,[158] and eventually gave the explanation that that the footage "was not tagged correctly . . . ."[159]

That morning, Plaintiff's counsel represented to the Court that Mrs. Wexler was willing to proceed with the trial—without an opportunity to depose Officer Ramirez or to conduct another deposition of Officer Hawkins about the content of the recording—but orally requested that Defendants be precluded from affirmatively using the Ramirez video in their defense.[160] The Court had not seen the recording, so it explained to counsel that it could not grant the request "until we're all on the same page as to what it says."[161] However, the Court gave a clear indication to counsel about its view: "[Y]ou can't possibly expect me to allow you . . . to use this as if it's some kind of exculpatory information."[162] The Court gave unambiguous notice to all parties that sanctions would need to be considered.[163] On the third day of trial, in addressing Plaintiff's oral motion to preclude Defendants' use of the footage, Defendants' counsel continued to raise unsubstantiated arguments that the Ramirez video had previously been

---

[157] *Id.* at 8 ("MR. SANTIAGO-PAGAN: . . . [T]here was a supplemental discovery request made through plaintiff's counsel . . . and in response to that request those body-worn camera videos were provided. MR. MALONE: Not the one in question. THE COURT: Not the one you just provided last week.").

[158] *Id.* at 9–10 ("THE COURT: You can't prove that it was turned over, you can't prove that it wasn't— MR. SANTIAGO-PAGAN: No, I can't— THE COURT: . . . [T]his is devastating information and [ ] it just turned up last week.").

[159] *Id.* at 9; *see also id.* at 15–16 ("MR. SANTIAGO-PAGAN: [T]here was one video on [the list] that wasn't familiar to me. . . . THE COURT: Strangely enough, it's one with a direct conversation between Hawkins and this other police officer— MR. SANTIAGO-PAGAN: Yes— THE COURT: —strangely enough that it was left off.").

[160] *Id.* at 6.

[161] *Id.*

[162] *Id.* at 14.

[163] *Id.* at 18.

produced.[164] That afternoon, it became increasingly evident to the Court that there was no documentary or testimonial evidence supporting counsel's contentions.[165]

Plaintiff's counsel called Officer Hawkins as of cross during Plaintiff's case and played part of the Ramirez video for the jury during that examination. On the fourth day of trial, during the direct examination of Officer Hawkins, Defendants' counsel requested to play a slightly longer clip of the Ramirez video.[166] Defendants' counsel stated explicitly that the purpose of introducing the additional few seconds was to rehabilitate Officer Hawkins, because "the portion that [Plaintiff's counsel] showed was an incomplete portion . . . ."[167] Plaintiff's counsel did not object to Defendants' affirmative use of the slightly extended clip, and the Court permitted the video to be played.[168] Defendants' counsel published that section of the video to the jury, again without objection from Plaintiff's counsel, and then asked Officer Hawkins a series of questions about statements she made in the recording.[169]

On examination from Plaintiff's counsel, Officer Hawkins reviewed a segment of the Ramirez video, during which she could be heard telling another officer that a police lieutenant (whose name was difficult to discern) was present at the scene.[170] On the stand, and for the first time, Officer Hawkins identified that individual as Lieutenant Long, who she described as a white male who previously worked in the 25th District.[171] After the jury was released for the

---

[164] Trial Tr. Jan. 18, 2024, at 3–5.

[165] *Id.* at 143.

[166] Trial Tr., Jan. 22, 2024, at 70–72.

[167] *Id.* at 70.

[168] *Id.* at 71–72.

[169] *Id.* at 73–78.

[170] Joint Ex. 30 at 1:22:09; Trial Tr., Jan. 22, 2024, at 137–39.

[171] Trial Tr., Jan. 22, 2024, at 138–39.

day, the Court held an extensive discussion with counsel about why Lieutenant Long's name and his presence at the scene had not been disclosed to Mrs. Wexler at any earlier point, notwithstanding her targeted discovery requests seeking the identities of relevant eyewitnesses.[172] In response, Defendants' counsel provided several unpersuasive justifications. Defendants' counsel asserted that they did not have control over Lieutenant Long as a witness because they themselves had not identified him (despite their client's identification of Lieutenant Long earlier that day).[173] They further argued that they had produced to Mrs. Wexler a list of all officers who were assigned to the parade, but that list failed to clarify which officers were at the scene or interacted with Mrs. Hawkins, and in any event, the list did not include Lieutenant Long.[174]

The Court noted on the record, outside the presence of the jury, that Defendants had been permitted to ask questions about the Ramirez video (notwithstanding Plaintiff's previous oral motion), and the Court had hoped that sanctions would not be necessary, but the extraordinarily late disclosure of Lieutenant Long as a relevant witness required further action from the Court.[175] The Court held that the late disclosure of the witness was attributable to defense counsel's failure to investigate the eyewitnesses who were at the scene.[176] Given the prejudice to Mrs. Wexler from the late disclosure—including her inability to depose Lieutenant Long before trial or to call him as a witness at trial—the Court held that an adverse inference instruction was warranted.[177]

---

[172] *Id.* at 310–24.

[173] *Id.* at 313–20.

[174] *Id.* at 316–20.

[175] *Id.* at 324.

[176] *Id.* at 314–15, 321.

[177] *Id.* at 321–24.

Defendants provide no basis to hold that a new trial is necessary because of the instruction or the manner in which the Court addressed Plaintiff's oral motion.

### C.  A New Trial Is Not Warranted Under Rule 59(a) on Grounds of Procedure, Prejudice, or Bias

####    1.   The Court Did Not Violate Rule 51(b)

Rule 51(b)(1) requires a court to "inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments," and subsection (b)(2) provides that a court "must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered . . . ."[178] "The Third Circuit has provided little instruction on the standards governing Rule 51(b)(2)."[179] Rule 51(c) provides that "[a]n objection is timely if . . . a party objects at the opportunity provided under Rule 51(b)(2); or . . . a party was not informed of an instruction or action on a request before that opportunity to object, and the party objects promptly after learning that the instruction or request will be, or has been, given or refused."[180]

Defendants argue that a new trial is warranted because of the Court's purported violations of Rule 51.[181] They assert that they were not made aware of the Court's "unilateral alterations" to the final jury instructions until they were delivered to the jury, and that Defendants "were prejudiced by being unable to object to the instructions on the record and out of the jury's hearing."[182] It is baseless to suggest that this Court failed to provide Defendants reasonable opportunity to object to the proposed instructions. The Court provided an electronic copy of the

---

[178] Fed. R. Civ. P. 51(b)(1)–(2).

[179] *Guynup v. Lancaster County*, No. 06-4315, 2009 WL 541533, at *7 (E.D. Pa. Mar. 3, 2009).

[180] Fed. R. Civ. P. 51(c)(2).

[181] Defs.' Mot. Post-Trial Relief at 4–5 [Doc. No. 102]; Defs.' Mem. Supp. Mot. Post-Trial Relief at 6–8 [Doc. No. 104].

[182] Defs.' Mem. Supp. Mot. Post-Trial Relief at 7 [Doc. No. 104].

draft instructions to counsel in advance of the first charge conference, which was held

telephonically on January 19, 2024.[183] It held a second charge conference late into the evening

after the close of trial proceedings on January 22, 2024.[184] Based on those lengthy discussions,

the Court incorporated some of counsel's revisions before providing another electronic draft on

the morning of January 23, 2024, the last day of trial. That morning, the Court held a third

colloquy with counsel, outside the presence of the jury, to address certain outstanding issues,

including another lengthy discussion about the appropriate probable cause standard and the

inclusion or exclusion of the harassment charge for some counts.[185] The Court provided counsel

with copies of a relevant opinion, *Alburg v. Jones*, in which the Third Circuit held that a district

court erred by failing to consider *Johnson* and its progeny.[186] The Court conveyed, on several

occasions, its view that the facts of this case aligned more with the *Johnson* framework.[187] The

Court also gave notice to counsel that the harassment charge would be added to the list of

relevant offenses for the false arrest count, but not the other counts.[188]

   During the afternoon lunch break, the Court provided hard copies of the final charge to

counsel and held yet another discussion about additional changes before the jury was brought in

and before the charge was delivered.[189] At that time, counsel proposed last-minute revisions to

---

[183] Due to inclement weather, there were no trial proceedings held on January 19, 2024.

[184] Trial Tr. Jan. 22, 2024, at 290–386.

[185] Trial Tr. Jan. 23, 2024, at 3–22. Defendants claim to have relied on the draft language sent on the morning of January 23, 2024. The Court gives little weight to Defendants' mistaken reliance. Given the morning dialogue, all parties understood that revisions to the charge were ongoing, and that the circulated draft was clearly not final.

[186] *Alburg*, 2023 WL 2823895 at *3 (citing *Harvard*, 973 F.3d at 199 n.3).

[187] Trial Tr. Jan. 23, 2024, at 5 ("You think all the charges came at once in this case?"); *id.* at 10 (noting that "the initiation of criminal proceedings isn't necessarily instantaneous in this case" and it "would be unfair to say it's only about what happened at the scene").

[188] *Id.* at 19–20.

[189] *Id.* at 86–89.

the verdict sheet and language concerning punitive damages, but did not otherwise object to the Court's final language in the hard-copy versions.[190] The trial transcript so reflects the following dialogue with counsel after the charge was delivered and before the jury began its deliberations:

> THE COURT: Thank you. Before the jury leaves, does counsel need to see me at sidebar?
> MR. MALONE: No, Your Honor.
> MR. KANE: Your Honor I think it can wait until the jury leaves.
> THE COURT: I'm not going to bring them [back] out, so.
> MR. KANE: Of course.
> THE COURT: Okay. That's fine, thank you. And you may retire to deliberate.[191]

In other words, the Court provided a final opportunity for counsel to object before the jury began its deliberations, and Defendants' counsel did not do so.

Defendants rely on only one case for the proposition that a new trial should be awarded based on a violation of Rule 51(b). However, in that case, *Marcavage v. City of Philadelphia*,[192] the Third Circuit vacated the judgment in the lower court because of substantive errors in the delivered charge, not procedural errors. Indeed, as the *Marcavage* court explained in a footnote, the parties specifically did not object to the trial court's procedure on appeal.[193] In any event, even assuming the Court failed to give adequate notice to counsel of these instructions before closing arguments,[194] Defendants did not suffer prejudice from the delivered charge. As the Court noted on the record immediately after the jury was sent to deliberate,[195] Defendants'

---

[190] *Id.*

[191] *Id.* at 139.

[192] 271 F. App'x 272 (3d Cir. 2008).

[193] *Id.* at 273 n.1 ("[N]either party objects to this procedure on appeal . . . .").

[194] Although Defendants contend that they "only became aware of the Court's unilateral alterations as the jury was instructed," Defs.' Mem. Supp. Mot. Post-Trial Relief at 7 [Doc. No. 104], they cannot plausibly suggest a lack of notice before the charge was delivered, given the final hard-copy version they received that afternoon which is attached to Defendants' brief. *See* Defs.' Mem. Supp. Mot. Post-Trial Relief, Ex. D [Doc. No. 104-4].

[195] Trial Tr. Jan. 23, 2024, at 141–42 ("I don't think your close was hampered at all by what this says.").

closing arguments were not adversely affected by the as-delivered language. Counsel argued to the jury that it would "hear harassment as part of" the probable cause instructions, but "[i]t's not always going to be mentioned."[196] Counsel further represented not only that "[t]he need for probable cause exists at all levels," but also that "there *is* probable cause at all levels here."[197]

Of the few statements made by Defendants' counsel that might be construed as referring to the *Wright* standard—*e.g.*, that the jury was required only "to find that there was probable cause for one" of the charges, or that probable cause existed "for simple assault, at the very least"[198]—each argument remained valid under the delivered charge for the unlawful arrest count, even if not for the malicious prosecution and retaliation counts.[199] At bottom, the jury was required to determine the facts of what happened during Mrs. Wexler's altercation with Officer Hawkins and the hours that followed. The transcript of Defendants' closing arguments makes clear that the delivered charge did not hinder Defendants from vigorously attacking Mrs. Wexler's ability to prove those disputed facts.[200] The Court will not grant Defendants a new trial on this basis.

      2.  <u>The Proceedings Were Not Affected by Judicial Bias or Plaintiff's Counsel's Inadvertent References to Non-Party the City of Philadelphia</u>

Defendants accuse the Court of being biased against them during the trial. Although Defendants highlight several examples of the Court's purported "injection" of its viewpoints

---

[196] *Id.* at 58–59.

[197] *Id.* at 59 (emphasis added).

[198] *Id.* at 58, 60.

[199] The Supreme Court recently reaffirmed in *Gonzalez v. Trevino* that "[t]he existence of probable cause does not defeat a [retaliatory arrest] claim if [a plaintiff] produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez*, slip op. at 1 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019)). The *Gonzalez* decision, as previously discussed, was issued on the same date as the *Chiaverini*, which endorsed the *Johnson* probable-cause standard in the context of malicious prosecution claims.

[200] *See id.* at 49–77.

during the proceedings, none support Defendants' baseless accusations.[201] First, Defendants refer

to the Court's statement that "[i]n this particular trial, the only person calling Charmaine

Hawkins a victim is Charmaine Hawkins."[202] The context of that statement shows that the Court

was responding to a problem of Defendants' counsel's own creation. During Defendants'

counsel's examination of Detective Koenig, while addressing the incident reports (Form 75-48)

completed by Officer Hawkins after the altercation, counsel repeatedly referred to Officer

Hawkins as "the victim" in those reports.[203] Upon objection from Plaintiff's counsel, the Court

ruled that Officer Hawkins should be referred to as the "alleged victim."[204] As the Court

explained to counsel shortly thereafter, outside the presence of the jury, the Court's ruling was

necessary to avoid prejudice to Mrs. Wexler, as it was inappropriate for the incident reports

(which Officer Hawkins wrote) to be construed as a definitive indication that Officer Hawkins

was ever found to be a victim in any formal setting.[205]

      Defendants further argue that the Court erroneously permitted Plaintiff's counsel to refer

to Defendants at trial as "the Government" or "the City." Defendants do not cite any case

supporting the proposition that such intermittent references to an employing municipality in an

individual capacity lawsuit warrant a new trial. In any event, the Court appropriately heard and

ruled upon objections throughout the trial to address those references.[206] Defendants contend that

---

[201] Defs.' Mem. Supp. Mot. Post-Trial Relief at 15 [Doc. No. 104].

[202] *Id.* (quoting Trial Tr. Jan. 18, 2024, at 70).

[203] Trial Tr. Jan. 18, 2024, at 69–70.

[204] *Id.* at 70.

[205] *Id.* at 78–79.

[206] *See, e.g.*, Trial Tr. Jan. 17, 2024, at 19–20 (granting Defendants' objection to Plaintiff's counsel's reference to "the City" during opening statement). Indeed, in one instance, Defendants' counsel unnecessarily interjected with argument about the issue in the presence of the jury, notwithstanding that the distinction between the individual Defendants and the City was not placed at issue by the testimony in question. *See id.* at 73–74 ("Mr. KANE: Well, Your Honor, the City is not a defendant. THE COURT: Yes, I know that. I know that and that's why I didn't say that in front of the jury that you just did.").

the Court erroneously overruled Defendant's objection on one occasion—specifically, Plaintiff's counsel's description of Defendants during closing argument as "officers of their state power," as well as his statements that "[t]hey're the government" and "all government power derives only from the consent of the governed."[207] The Court, in its discretion, did not find an appropriate basis to preclude such arguments, given the requirement under § 1983 that government employees may be liable only if they act under color of state law.[208] The Court identifies no error and will not grant a new trial on this ground.

3.   <u>Defendants Failed to Present Evidence Regarding Their Personal Finances</u>

Defendants argue that the Court improperly precluded them from introducing evidence regarding their personal finances, which they contend should have been presented to the jury before it awarded punitive damages. That argument presumes that Defendants' counsel were prepared to present evidence regarding their clients' financials at trial. Not so. In steps of obvious non-compliance, Defendants failed to produce documents or information about their finances at any point during the discovery period. At trial, they did not present any such evidence before resting on January 22, 2024. Indeed, counsel's first request to present their clients' salaries and assets came on the morning of January 23, 2024, after the close of evidence but before closing arguments.[209] In response, the Court conveyed its view that proceeding in such a manner was inappropriate for numerous reasons—namely, because counsel had not produced any supporting documentation (*e.g.*, bank statements or other indicia of net worth) for Plaintiff's counsel or the Court to review.[210] However, the Court held that the issue should be decided only

---

[207] Trial Tr. Jan. 23, 2024, at 25.

[208] *See Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007).

[209] Trial Tr. Jan. 23, 2024, at 16.

[210] *See id.* at 16–18.

after the jury made its preliminary determination regarding whether punitive damages would be awarded in the first instance.[211]

During its deliberations, the jury submitted a note to the Court indicating that it was ready to receive additional instructions regarding punitive damages.[212] Defendants' counsel renewed their request to present evidence on their clients' financial resources, but only in the form of uncorroborated testimony.[213] Even at that late stage, counsel had gathered no supporting documentation to verify whatever figures their clients intended to convey orally from the stand. The Court again communicated its view about the impropriety of reopening the record for additional witness testimony at that late stage of the proceedings, which at a minimum would have required providing Plaintiff's counsel an opportunity to conduct cross-examination (for which Plaintiff and her counsel could not have reasonably prepared).[214]

It is not the practice of this Court to condone litigation tactics which amount to a trial by ambush. Accordingly, outside the presence of the jury, the Court suggested that the parties consider reaching a stipulation about the relevant figures, and Plaintiff's counsel expressed a willingness to reach one if Defendants' counsel could attest to their clients' salaries and assets.[215] However, when Plaintiff's counsel attempted to confer with opposing counsel about a stipulation, he was told that Defendants' counsel *had not even asked their clients* about what those figures were, notwithstanding that the jury had been deliberating for over two hours by that

---

[211] *Id.* at 14, 17–18.

[212] Jury Questions at 4 [Doc. No. 85] ("Ready for punitive damages instructions[.]").

[213] Trial Tr. Jan. 23, 2024, at 157, 162.

[214] *Id.* at 157, 162.

[215] *See id.* at 162.

point in time.[216] Defendants' counsel explicitly admitted to the Court at sidebar that, despite his renewed request to reopen the record for his clients to testify, he had "not reviewed their financials" and "would have to ask them what their salaries are."[217]

Defendants' counsel were unprepared or unwilling to face the reality that punitive damages were to be considered by the jury. At every turn, they maintained a recalcitrant attitude toward even the possibility of punitive damages being awarded. And yet, when they were given the opportunity, at the latest possible moment in the trial, to prepare and/or present pertinent evidence about their clients' personal finances, they neglected to do so. They now contend that the Court should nevertheless have granted their "requests to put on testimony . . . ."[218] Such prejudice to Mrs. Wexler would have been untenable, and any further delay would have been unreasonable. Through their deliberate actions, defense counsel waived their right to present such evidence. The Court identifies no basis for a new trial based on this sequence of events.

### D.  Remittitur of the Punitive Damages Award Is Required

Defendants argue that the punitive damages awards of $500,000 each against Officer Hawkins and Detective Koenig are unconstitutionally excessive and are plainly disproportionate to the harm Plaintiff suffered.

The right to a trial by jury includes giving a measure of deference to a jury's determination of appropriate punitive damages, particularly where such an award is free of irrationality, passion, and prejudice.[219] There is no question here that the jury, after making its

---

[216] *Id.* ("MR. MALONE: . . . I asked counsel during the break do you know their financial situations and the answer was I haven't even asked them. So I don't know what I can stipulate to when I haven't even been told— THE COURT: But you offered to stipulate to it. MR. MALONE: Yes[.]").

[217] *Id.* at 168.

[218] Defs.' Mem. Supp. Mot. Post-Trial Relief at 18 [Doc. No. 104].

[219] *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005).

credibility assessments, accepted Mrs. Wexler's testimony and rejected the narratives of Officer Hawkins and Detective Koenig. Its punitive damages awards of $500,000 against each Defendant must be acknowledged as the jurors' collective, reasoned assessment of Defendants' wrongs and the egregiousness of each Defendant's conduct in this case. The modest compensatory awards, by contrast, reflect the jurors' careful consideration of the evidence, rather than an arbitrary approach based on unsupported speculation. The Court is loath to conclude that the jury's punitive damages awards were unreasonable in this case. However, the Court has latitude to consider a remittitur for an award that may exceed constitutional bounds.

The Supreme Court has explained that "[c]ompensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct [while] punitive damages serve a broader function; they are aimed at deterrence and retribution."[220] As to the factual question of proportionality between a punitive damages award and evidence of harm, "[t]he district judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion."[221] As to constitutional excessiveness, in evaluating a punitive damages award, district courts must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[222]

---

[220] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quotation marks and citations omitted).

[221] *Spence*, 806 F.2d at 1201 (citing *Murray*, 610 F.2d at 152–53).

[222] *State Farm*, 538 U.S. at 418 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996)).

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[223] In evaluating reprehensibility, courts consider whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.[224] No one factor is necessarily sufficient, but the absence of all of them renders any punitive damages award suspect.[225]

Even a cursory review of the relevant factors identified by the Supreme Court confirms that a substantial punitive damages award is well supported in this case. Over five days of proceedings, the evidence presented at trial told a troubling story. What began with an innocuous exchange between a pedestrian and a police officer on a sunny day in June, amid joyful and peaceful celebrations on the streets directly in front of the courthouse doors, evolved into a shocking escalation of events which evinced flagrant abuse of authority at every turn.

The injuries Mrs. Wexler suffered included physical harm. Officer Hawkins, as evasive and combative as she was on the stand,[226] ultimately confessed—albeit only after being confronted with her prior under-oath statements—to having "put one hand around" Mrs. Wexler's neck.[227] Assigning due weight to the jury's reasonable finding that Officer

---

[223] *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575).

[224] *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77).

[225] *State Farm*, 538 U.S. at 419.

[226] Regrettably, the Court was required on several occasions to reprimand Officer Hawkins (outside the presence of the jury) for her disruptive behavior, which served only to frustrate the efficiency of the proceedings and demonstrated arrogance and a lack of respect for the judicial process. *See, e.g.*, Trial Tr. Jan. 18, 2024, at 231–32. For example, when Plaintiff's counsel engaged in a line of questioning regarding the location of the record button on a body-worn camera, Officer Hawkins repeated the same vague answer ("the top") eight times. *Id.* at 174.

[227] Hawkins Test., Trial Tr. Jan. 18, 2024, at 239.

Hawkins lacked probable cause to intensify the confrontation, her grabbing of Mrs. Wexler's throat, standing alone, evinces blatant indifference to Mrs. Wexler's health and safety. The jury was entitled to find that both Defendants then engaged in repeated conduct demonstrating a reckless and wanton disregard for the truth. In the immediate aftermath of the incident, Officer Hawkins, apparently dissatisfied with the CVN for disorderly conduct which had already been written at the scene, prepared handwritten reports presenting a distorted factual narrative against Mrs. Wexler. She repeated her falsehoods during her interview with Detective Koenig, and later during the criminal proceedings against Mrs. Wexler.

Detective Koenig, in turn, admitted explicitly on the stand that he chose to accept Officer Hawkins's story for the sole reason that she was a sworn officer. Detective Koenig's blind reliance on Officer Hawkins's statements is all the more deplorable in light of his failure to inquire about the existence of body-worn camera footage of the incident (which there was none); his failure to take any steps to identify police or civilian eyewitnesses; and his decision not to speak to Mrs. Wexler or conduct any inquiry into her potential injuries before submitting serious criminal charges against her to the DA. Detective Koenig's failure to fulfill his duty to investigate—including his decision not to speak to Mrs. Wexler or photograph her injuries, in violation of the Philadelphia Police Department's Directives[228]—evinced intentional malice and a blatant indifference to Mrs. Wexler's health and safety.[229]

Regarding the second guidepost, the Supreme Court has declined to impose a bright-line ratio which a punitive damages award cannot exceed, and it has "consistently rejected the notion

---

[228] Koenig Test., Trial Tr. Jan. 17, 2024, at 182–83, 194, 199; Koenig Test., Trial Tr. Jan. 18, 2024, at 34–37.

[229] *See Keenan v. City of Philadelphia*, 983 F.2d 459, 470–72 (3d Cir. 1992) (upholding $133,333.35 punitive damages award against defendant police inspector for his deliberate "refus[al] to intercede in any way" to address allegations of sex discrimination he acknowledged were a "problem").

that the constitutional line is marked by a simple mathematical formula . . . ."[230] The Court has generally observed "that an award of more than four times the amount of compensatory damages *might* be close to the line of constitutional propriety."[231] However, given that "there are no rigid benchmarks," the Court has clarified that "ratios greater than those . . . previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"[232] "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine," and district courts may consider potential harm arising from a defendant's conduct, even if not realized, as part of the calculus.[233]

In this case, in addition to photographs and testimony regarding Mrs. Wexler's physical injuries, the jury received evidence speaking to Mrs. Wexler's emotional and psychological harms arising from her 16 hours of detention (without medical attention) and her defense against serious criminal charges (including a felony count).[234] Such harms would be difficult for any reasonable jury to quantify in economic terms. The ratios of punitive to compensatory damages were 125-to-1 for Officer Hawkins and 250-to-1 for Detective Koenig. Critically, however, the respective compensatory damages awards against each Defendant were low figures—$4,000 against Officer Hawkins and $2,000 against Detective Koenig. Those compensatory amounts

---

[230] *See State Farm*, 538 U.S. at 424–25 (quoting *Gore*, 517 U.S. at 582).

[231] *State Farm*, 538 U.S. at 425 (emphasis added) (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)); *see also Gore*, 517 U.S. 559.

[232] *State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582).

[233] *Gore*, 517 U.S. at 582; *State Farm*, 538 U.S. at 418, 424–25.

[234] The Court notes the testimony from Mrs. Wexler's husband describing changes he perceived in his wife's behavior during and after the relevant events. *See, e.g.*, D. Wexler Test., Trial Tr. Jan. 17, 2024, at 36–37 ("[I]t was a very rough time. She would frequently—couldn't get to sleep or, if she did, she would wake up kind of shaking and kind of whimpering and crying. . . . Whenever we would even go out and there were police, she would almost like try to stay on the other side of the street or whatever, but it was very tough.").

demonstrate that the jury did not act out of passion or prejudice but rather made a reasoned determination, based on the evidence, that even though Mrs. Wexler's actual damages warranted a smaller sum, a significantly higher punitive damages award was appropriate due to the wrongfulness of Defendants' abuses. The Court is not persuaded that the jury's relatively modest compensatory awards constitutionally precluded an assessment of substantial punitive damages for the twin purposes of retribution and deterrence.

Under established precedent in the Third Circuit, unanimously adopted by every other federal circuit to have considered the issue, punitive damages are permitted in § 1983 cases against public officials even when a jury awards only *nominal* damages.[235] Courts have often observed that a rigid application of proportionality in cases seeking vindication of constitutional rights—which are more likely to result in low or nominal damages—would defeat a jury's ability to award punitive damages at all.[236] In cases like this one, where a plaintiff alleges reprehensible misconduct by public officials but the compensatory award is low, "*any* appreciable exemplary award would produce a ratio that would appear excessive" under a strict proportionality standard.[237] This Court agrees with the persuasive guidance from other circuit courts that "the ratio component of the excessiveness inquiry . . . [is] of limited relevance in § 1983 cases where

---

[235] *Basista v. Weir*, 340 F.2d 74, 87–88 (3d Cir. 1965); *see also Gill v. Manuel*, 488 F.2d 799, 802 (9th Cir. 1973) (holding on appeal in a § 1983 suit against police officers that "an award of compensatory damages is not a necessary prerequisite to an award of punitive damages" (citing *Basista*, 340 F.2d at 88)); *Guzman v. W. State Bank of Devils Lake*, 540 F.2d 948, 953 (8th Cir. 1976); *Silver v. Cormier*, 529 F.2d 161, 163–64 (10th Cir. 1976); *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir. 1980); *Glover v. Ala. Dep't of Corr.*, 734 F.2d 691, 694 (11th Cir. 1984), *rev'd on other grounds*, 474 U.S. 806 (1985); *Erwin v. Manitowoc County*, 872 F.2d 1292, 1299 (7th Cir. 1989); *King v. Macri*, 993 F.2d 294, 297–98 (2d Cir. 1993); *De Jesus Nazario v. Morris Rodriguez*, 554 F.3d 196, 204–05 (1st Cir. 2009).

[236] *Williams v. Kaufman County*, 352 F.3d 994, 1016 (5th Cir. 2003).

[237] *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) ("In *Gore*, a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration.").

the basis for the punitive damages award was[,] [*e.g.,*] the plaintiff's unlawful arrest and the plaintiff's economic injury was so minimal as to be essentially nominal."[238]

Given the limited utility of the ratio component in this § 1983 case, the Court carefully addresses the third constitutional guidepost, which requires a review of the penalties imposed in comparable cases. The Court has surveyed the punitive and compensatory damages awards in other comparable excessive force, false arrest, and malicious prosecution cases, some of which are summarized below. To account for the effects of inflation in intervening years, the following list includes both the actual punitive damages award and (*) that amount adjusted to 2024 dollars using the Consumer Price Index:[239]

- $50,000/$60,233* ($1 in nominal damages): After an initial attempt to flee, plaintiff surrendered by lying face down with his arms outstretched. Officer used knee strike and choked and punched plaintiff. *Kidis v. Reid*, 976 F.3d 708 (6th Cir. 2020).

- $40,000/$71,627* ($1,000 in compensatory damages): Plaintiff, while handcuffed and recovering from pepper spray in a police car, was pepper sprayed again by defendant officer. *Blackledge v. Carlone*, 126 F. Supp. 2d 224 (D. Conn. 2001).

- $100,000/$135,053* ($60,000 in compensatory damages): After plaintiff, while handcuffed, kicked officer in the groin, officer punched plaintiff in the face and neck and kneed him in the back. *Payne v. Jones*, 711 F.3d 85 (2d Cir. 2013).

- $75,000/$148,554* ($1 in nominal damages and $1,000 in compensatory damages on state law claim): Officers handcuffed plaintiff and beat him in the head with a baton. Subsequent criminal charges for assaulting a police officer and resisting arrest were later dropped. *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996).

---

[238] *Arnold v. Wilder*, 657 F.3d 353, 370 (6th Cir. 2011) (quotation marks omitted) (quoting *Romanski v. Detroit Ent., LLC*, 428 F.3d 629, 645 (6th Cir. 2005)); *cf. State Farm*, 538 U.S. at 425–26 (cautioning that higher ratios particularly run the risk of exceeding the upper parameters of due process "when compensatory damages are *substantial*," and therefore rejecting a 145-to-1 ratio where the plaintiffs had been awarded $1 million in compensatory damages for a year and a half of emotional distress (emphasis added)).

[239] Consumer Price Index Inflation Calculator, U.S. Dep't of Labor, Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.htm (last visited May 17, 2024).

- $150,000/$326,160[*] (nominal damages on excessive force and false arrest claims and $75,000 in compensatory damages on malicious prosecution claim): After altercation with defendant court security officers at state courthouse, plaintiff held at Rikers Island for two months awaiting trial on criminal charges which were later dropped. *King v. Macri*, 993 F.2d 294 (2d Cir. 1993).

- $150,000/$365,441[*] ($650,000 in compensatory damages): During dispute over parking violation, police officer attacked plaintiff, causing two displaced vertebrae, a cracked rib, and serious head trauma, then pressed his gun into plaintiff's head. Plaintiff was held in custody for 60 hours, made to stand trial, and acquitted on all counts. *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990).

- $550,000/$760,069[*] ($57,400 in compensatory damages): Officer placed plaintiff in a chokehold and pepper sprayed her in front of her school-aged children, after which she was arrested, held for six hours, and arraigned on felony and other charges on which she was found not guilty. *Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011).

- $600,000/$944,422[*] ($279.05 in compensatory damages): Plaintiff was detained by defendant casino security officer, who represented herself to be a police officer, for finding and playing a five-cent token at a slot machine. *Romanski v. Detroit Ent., LLC*, 428 F.3d 629 (6th Cir. 2005).

- $2 million/$2.86 million[*] ($500,000 in compensatory damages): During traffic stop, defendant state trooper held plaintiff police detective at gunpoint, used pepper spray, and struck plaintiff's head, after which plaintiff was criminally charged. *Wade v. Colaner*, No. 06-3715, 2010 WL 5479629 (D.N.J. Dec. 28, 2010).

- $2.2 million/$3.99 million[*] ($778,000 in compensatory damages): Defendant officer permitted inmate into plaintiff's cell. Plaintiff was viciously beaten, suffered for hours, and ultimately died. *Gregory v. Shelby County*, 220 F.3d 433 (6th Cir. 2000).

Although this Court accords deference to this range of outcomes (as it must), it remains true that the determination of a just punitive damages award cannot be reduced to a wooden application of comparable awards, for the same reasons that the calculus cannot be simplified to a mathematical formula. Each case is decided independently, just as this unique jury of eight citizens brought their own sense of reasonableness to their decision. The jury's verdict was a wholesale repudiation of Defendants' factual narrative, resulting in a finding of liability on each and every one of the seven state and federal counts. Moreover, unlike in other comparable cases

48

involving mitigating factors—*e.g.*, an admission to having driven while intoxicated,[240] or having kicked a law enforcement officer in the groin[241]—this case involved an attack by a police officer upon a citizen who, the jury necessarily found, was a law-abiding citizen merely trying to cross a street after leaving synagogue, as well as a police detective's attempt to cover up that officer's misconduct by intentionally and blindly accepting her word. Because of the felony and other criminal counts filed against her, Mrs. Wexler was required to retain counsel and defend herself throughout several proceedings before all charges were withdrawn and dismissed.

"Th' abuse of greatness is when it disjoins remorse from power."[242] Increasingly, the citizens in our Nation have come to realize that they need not bend to the will of any police officer for any improper reason. It has never been acceptable for law enforcement officials, who are bound by a sworn obligation to uphold the law, to use excessive force upon a law-abiding citizen for attempting to cross the street or exercising her right to criticize the police, as the jury reasonably found in this case. It is all the more perverse for police officers to orchestrate criminal charges *ex post* against that injured citizen in an attempt to avoid responsibility. Arrogance and power are a dangerous combination. When further combined with ignorance and hostility, this type of abuse by police officials can occur, and did occur.

In this case, notwithstanding the jury's low compensatory damages awards, the reprehensibility of Defendants' conduct supports a substantial constitutional limit for punitive damages. In line with the harm suffered by Mrs. Wexler here, and taking each of the guideposts into consideration, the Court finds that the constitutional upper limit in this case is a punitive damages award of $250,000 against Officer Hawkins and $250,000 against Detective Koenig.

---

[240] *Lee*, 101 F.3d at 807.

[241] *Payne*, 711 F.3d at 101.

[242] William Shakespeare, Julius Caesar act 2, sc. 1.

The equality of the jury's original punitive damages awards was appropriate, as neither Defendant could have caused the full extent of constitutional harm without the other, so the Court imposes the same adjusted amount against each Defendant. These reduced amounts give deference to the jury's determination and serve the purposes of retribution and deterrence, while also conforming with constitutional due process limitations.[243]

## IV. CONCLUSION

For the reasons stated herein, Defendants' motion will be granted in part and denied in part. The Court will grant a partial remittitur of the jury's punitive damages awards. The Court declines to grant Defendants a new trial under Rule 59(a) or judgment as a matter of law under Rule 50(b). An order follows.

---

[243] Because the Court has based its decision on due process concerns, not because the award is inconsistent with the evidence in the case, the award is reduced as a matter of law, and no new trial on damages is required. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TZVIA WEXLER,** : | |
| **Plaintiff,** : | |
| : | **CIVIL ACTION** |
| **v.** : | **No. 19-CV-5760-CMR** |
| : | |
| **CHARMAINE HAWKINS, et al.,** : | |
| **Defendants.** : | |
| : | |

## <u>JOINT STAMENT</u>

Defendants, Charmaine Hawkins, James Koenig, and Kelly Keenan, and Plaintiff, Tzvia Wexler, by and through the undersigned counsel, hereby respectfully submit this joint statement pursuant to the Court's instruction on September 28, 2023, following a scheduled telephone conference on December 20, 2023, regarding the following:

(a)  Agreed upon and disputed facts.

The parties stipulate to the following undisputed facts: date, time, and location; that Plaintiff, Tziva Wexler, was arrested and criminally charged which terminated in Plaintiff's favor; that Defendants, Police Officer Hawkins, was acting as a police officer in full uniform on June 9, 2019. The parties dispute all other facts leading up to and following Plaintiff's arrest on June 9, 2019.

(b)  Objections to any proposed witnesses.

The parties agree to exclude witnesses Dr. Phillip Nimoityn, Ofra Sharabani, and Kimberly Klayman (except as may be needed on rebuttal). Defendants object to any witness not named in Plaintiff's Pre-Trial Memo. (ECF No. 44).

(c)  Objections to any proposed exhibits (including objections to genuineness and authenticity).

The parties agree to individually list the documents in Plaintiff's exhibit "Criminal Case Discovery Packet" as individual exhibits. Defendants object to Plaintiff's proposed exhibits PPD Directives 1, PPD Directive 4.21, and PPD Directive 10.2, in accordance with and for reasons set forth in Defendants' Motion in Limine. (ECF No. 53).

(d)  Objections to any depositions to be read at trial.

The parties agree to the admissibility of all depositions listed in the Joint Exhibit List (ECF No. 45), for purposes of impeachment.

(e)  Disputed legal issues.

The remaining disputed legal issue is Defendants' objection to Plaintiff's proposed exhibits PPD Directives 1, PPD Directive 4.21, and PPD Directive 10.2, in accordance with and for reasons set forth in Defendants' Motion in Limine, (ECF No. 53), to which Plaintiff has filed no response.

(f)  Amendments to pleadings.

The parties agree to stipulate Plaintiff's voluntary withdrawal with prejudice of Count VIII – False Light/Invasion of Privacy under PA law (against all defendants) of Plaintiff's complaint. (ECF No. 1). The parties agree to stipulate Plaintiff's voluntary withdrawal with prejudice of all claims against Defendant Kelly Keenan and removal of Kelly Keenan as a Defendant in the present matter.

(g)  Stipulated to and disputed points for charge:

The parties stipulate to the language contained in Defendant's proposed points for charge. (ECF No. 49).

(h)  Verdict sheet and special interrogatories.

The parties stipulate to Defendants' proposed verdict sheet. (ECF No. 50), with changes made pursuant to the withdrawal of Count VIII – False Light/Invasion of Privacy under PA law (against all defendants) of Plaintiff's complaint, and withdrawal of all claims against Defendant Kelly Keenan.

The parties stipulate to Defendants' proposed voir dire (ECF No. 51), with the addition of the following voir dire questions:

Some events in this case took place during the 2019 Pride Parade, which celebrates the Lesbian, Gay, Bisexual, and Transgender community, is there any reason this would affect your ability to render a just, fair, honest, and impartial verdict?

The Plaintiff in this case is employed by "Friends of Israel Disabled Veterans" and was previously employed by "Friends of the Israeli Defense Forces," which support the country of Israel and it's military; is there any reason this would affect your ability to render a just, fair, honest, and impartial verdict in this case?

(i)  Number of days required for trial.

The parties agree that 3 to 4 days will be required for trial.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TZVIA WEXLER,** : | |
|                 **Plaintiff,** : | |
| : | |
| : | **CIVIL ACTION** |
|     **v.** : | **No. 19-CV-5760-CMR** |
| : | |
| **CHARMAINE HAWKINS, et al.,** : | |
|                 **Defendants.** : | |
| : | |

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on the date below, the Joint Statement, was emailed to the Court and all counsel.

Date:  December 21, 2023

                                       Respectfully submitted,

                                       */s/ Jonah Santiago-Pagán*
                                       Jonah Santiago-Pagán
                                       Pa. Attorney ID No. 326442
                                       City of Philadelphia Law Department
                                       1515 Arch Street, 14th Floor
                                       Philadelphia, PA 19102
                                       215-683-5428 (phone)
                                       215-683-5397 (fax)
                                       jonah.santiago-pagan@phila.gov